[830 NYS2d 87]

TAG 380, LLC, Appellant-Respondent, v ComMet 380, Inc., Respondent-Appellant and Third-Party Plaintiff. GMAC Commercial Mortgage Corporation, Third-Party Defendant-Intervenor-Respondent.

First Department, February 13, 2007

**APPEARANCES OF COUNSEL**

*Rosenberg & Estis, P.C.*, New York City (*Michael E. Feinstein* and *Warren A. Estis* of counsel), for appellant-respondent.

*Seward & Kissel LLP*, New York City (*Bruce G. Paulsen, Jeffrey M. Dine* and *Daniel S. Marvin* of counsel), for respondent-appellant.

*Cadwalader, Wickersham & Taft LLP*, New York City (*Jason M. Halper* and *Gregory A. Markel* of counsel), for GMAC Commercial Mortgage Corporation, respondent.

**OPINION OF THE COURT**

TOM, J.P.

Plaintiff TAG 380, LLC (tenant) seeks a declaration of its rights and obligations as assignee of a 1989 ground lease to the premises known as 380 Madison Avenue in New York County. Defendant ComMet 380, Inc. (landlord), a real estate investment trust, currently owns the property, and nonparty RREEF America LLC, a national real estate asset management company, is ComMet's asset manager for the building. Specifically, the parties dispute the extent of tenant's duty under the terms of the lease to obtain insurance coverage for the premises, particularly for damage resulting from acts of terrorism. This action was precipitated by landlord's August 5, 2002 notice of lease default stating that coverage obtained for the property by tenant failed to comply with the insurance covenant of the lease "in that said insurance does not contain adequate insurance against losses resulting from terrorism" and demanding that tenant "cure such default immediately." The notice contained a reminder that the lease affords landlord the right to remedy any default in tenant's performance at tenant's expense.

Upon commencement of its declaratory judgment action in mid-August 2002, tenant sought and obtained a *Yellowstone* injunction (*First Natl. Stores v Yellowstone Shopping Ctr.*, 21 NY2d 630 [1968]) restraining landlord, pending decision of this action, from terminating the lease based upon the notice of default. In late September, landlord answered and counterclaimed for a declaration that tenant is required to obtain insurance coverage that does not exclude acts of terrorism and is therefore in breach of the lease. The counterclaim further seeks compensatory damages together with attorney's fees incurred in defending the declaratory judgment action. Landlord was subsequently granted leave to amend the answer and counterclaim to assert causes of action seeking damages for sums expended to obtain terrorism coverage for the premises, as required by the terms of its mortgage with third-party defendant GMAC Commercial Mortgage Corporation.

This matter is before us on appeal from the disposition of landlord's motion and tenant's cross motion for summary judgment (CPLR 3212) seeking, respectively, dismissal of the complaint and dismissal of the counterclaims. In contention is the interpretation of article 6 of the lease, which requires tenant to maintain

> "insurance on the building against loss or damage

> by fire and against loss or damage by other risks
> included under the standard Extended Coverage
> Endorsement as presently adopted for use with the
> New York Standard Fire Insurance Policy in an
> amount not less than the then full insurable value
> of the Building, with a deductible of not more than
> $50,000."

At the time the lease took effect in 1989, the Extended Coverage Endorsement included causes of loss resulting from hazards in addition to fire, such as smoke, explosion, riot and civil commotion and "actual physical contact of an aircraft or vehicle with the property." Specifically excluded were such hazards as nuclear reaction and radioactive contamination, war (including insurrection or civil war) and "hostile and warlike action" undertaken "by any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval or air forces," including action "by an agent of any such government, power, authority or forces." Terrorism is neither included as a covered peril, nor excluded (the exclusion applying only to acts of governments or sovereign powers).

Supreme Court resolved the issue of insurance coverage in favor of landlord, rejecting tenant's argument that because terrorism is not specifically enumerated as a covered cause of loss in the Extended Coverage Endorsement, it is not a peril against which coverage must be maintained pursuant to the lease. The court reasoned that "unless specifically enumerated in the exclusions section of the policy," a fire insurance policy must cover all losses that result from fire, "even if such losses are caused by terrorism." Thus, the court concluded that acts of terrorism must be deemed to be within the ambit of the endorsement. We disagree.

The endorsement is silent as to acts of terrorism, neither including nor excluding terrorist acts from the scope of the protection afforded. In concluding that the Extended Coverage Endorsement protects against terrorism, the court failed to distinguish between a cause of damage and its resulting effect. "Fire" is an enumerated "cause" of loss under the standard fire insurance policy, and a covered "peril" denotes a cause, not the ensuing effect on the covered property (*see Catalanotto v Commercial Mut. Ins. Co.*, 256 AD2d 883, 884 [1998]). Clearly, a fire resulting from physical contact between an aircraft and the building (an enumerated cause) is a covered loss under the endorsement, while a fire resulting from a warlike act (a specified exclusion) is not. As the court correctly perceived, the

endorsement in effect at the time the lease commenced required the premises to be covered only against the causes of loss provided therein, such as physical contact with an aircraft, irrespective of whether such cause might be attributable to a terrorist act or not.

The excluded risk under the endorsement concerning acts of war, including warlike action, contemplates acts by a hostile nation or by a standing military force; it does not address ad hoc paramilitary action by agents who are neither identified with any particular sovereign power nor affiliated with any organized military force. The language does not embrace the concept of a terrorist organization, loosely structured into autonomous cells, supported by funding from disparate sources and promoting an uncertain political or, ostensibly, religious agenda. The endorsement simply does not deal with the subject of terrorism.

A policy of insurance should not be extended beyond its plain meaning to include perils not specifically covered by its provisions (*see e.g. Harrigan v Liberty Mut. Fire Ins. Co.,* 170 AD2d 930 [1991]). Simply because the subject endorsement affords coverage for a particular loss attributable to an act of terrorism (such as an aircraft striking the building) does not dictate the conclusion that the endorsement affords coverage for all terrorist acts, irrespective of the precipitating cause of loss. To construe the endorsement so broadly would violate the venerable principle that the parties to an agreement will not be required to assume any obligation not reasonably within their contemplation at the time of contract (*Hadley v Baxendale,* 9 Exch 341, 156 Eng Rep 145 [1854]).

*BFP 245 Park Co., LLC v GMAC Commercial Mtge. Corp.* (12 AD3d 330 [2004]), relied on by landlord, does not support its position. The agreement at issue in that case (a mortgage) required insurance coverage against any peril included within the "all risk" or "special perils" classification; it did not involve enumerated perils as contained in the Extended Coverage Endorsement referenced by the subject lease. Furthermore, the mortgage in *BFP* "contemplated a flexible obligation subject to change as the marketplace recognized new insurable risks" (*id.* at 331), reflected by the provision for coverage against " 'any peril now or hereafter included' " in the all risk or special perils classification (*id.*), not, as here, a specific and static obligation based upon the Extended Coverage Endorsement "as presently adopted for use with the New York Standard Fire Insurance Policy" in 1989. Thus, we conclude that the parties' lease does

not require tenant to maintain terrorism insurance on the premises.

Landlord's alternative theory is that it should be reimbursed for the cost of obtaining terrorism coverage because tenant failed to provide proof that it had, in fact, obtained, such coverage. In August 2002, after this action had been commenced, landlord was informed that tenant had obtained partial terrorism coverage for the subject premises in July 2002 in the amount of $100 million. In May 2003, in the course of discovery, landlord received proof that, in October 2002, an affiliated entity had obtained blanket terrorism insurance providing an additional $300 million in coverage for the premises, sufficient to fully insure the property against damage due to terrorist acts. Landlord then amended its counterclaim to assert additional causes of action for negligent misrepresentation and breach of the implied duty of good faith and fair dealing. Consideration of landlord's additional bases for recovery warrants a more detailed exposition of the facts.

The insurance policy in existence before this controversy arose was scheduled to expire on June 30, 2002. There is no dispute that this policy provided the coverage required by the lease. On May 31, RREEF, the asset manager for the building, sent tenant a reminder that the lease requires proof of new insurance coverage to be provided at least 30 days prior to expiration of the current policy. The letter asserts that, "to be in compliance with the terms of the lease, the Property is to be insured against terrorist acts. It is our understanding that your prior policy covered such acts and we request that you continue to maintain such coverage." In response, RREEF received a letter dated June 18, 2002 from tenant's chief executive officer, Steven M. Cherniak, noncommittally stating that TAG 380, LLC would place insurance "of the type required pursuant to the lease," and would provide proof of such coverage, "all as required pursuant to the lease."

Mr. Cherniak's affidavit submitted in opposition to landlord's summary judgment motion explains that TAG 380, LLC, the sole shareowner of which is Sheldon Solow, had previously "maintained 'all-risk' property insurance coverage as part of a 'blanket' policy covering, in addition to 380 Madison, multiple other buildings owned by TAG's affiliated companies." The affidavit asserts that such all-risk coverage was obtained despite the lease provision that tenant need maintain only the more limited named-perils coverage, as described in the Extended

Coverage Endorsement. Thus, the policy due to expire in June 2002 contained no exclusion for acts of terrorism.

After the attack on the World Trade Center on September 11, 2001, issuers of property damage coverage on New York City office buildings began to exclude terrorism from their all-risk policies as they came up for renewal. As a result, the binder received by tenant (which was provided to landlord) for the policy effective during the following year contains the notation "TERRORISM IS EXCLUDED."

Correspondence between the parties indicates that landlord was advised, in an August 5, 2002 telephone call (the same day landlord issued its notice of lease default), that "Solow had purchased $100 million of terrorism coverage that will cover the property at 380 Madison Ave., New York City." However, no proof of such coverage was received by landlord until February 2003, after landlord moved to compel disclosure in response to its demand for document production in this action. Mr. Cherniak's affidavit in opposition to the motion discloses that the insurance was obtained in connection with the refinancing of the mortgage for an office tower located at 9 West 57th Street in Manhattan. During summer-fall 2002, when Solow was negotiating a mortgage refinancing for this high-profile building, the lender imposed the condition that it be covered by terrorism insurance. Solow Management Corporation then obtained blanket terrorism coverage for 16 properties owned by Solow-related entities, including the subject premises. The first policy, in the amount of $100 million, was effective for the period from July 2002 through July 2003, and the second, in the amount of $300 million, for the period from October 2002 through October 2003.

Throughout this dispute, tenant has taken the position that it was not obligated to notify landlord that terrorism coverage had been obtained. As expressed by Mr. Cherniak, "Because TAG was *not* required by the terms of the Lease to provide terrorism coverage on the Building, TAG had no obligation, under Articles 6.03 and 6.05 of the Lease, . . . to provide evidence of this insurance to ComMet."

Tenant's position is fully supported by the terms of the lease. Article 6.03 requires that tenant supply to landlord, "not less than thirty (30) days prior to the expiration date of any policy theretofore furnished pursuant to this Article and then required hereunder, a certificate or duplicate original of such policy." Tenant duly provided the binder for the new policy containing the notation that "TERRORISM IS EXCLUDED." Article 6.05

of the lease requires only that tenant notify landlord if it obtains "separate insurance concurrent in form or contributing in the event of loss with that required in this Article to be furnished by Tenant." As decided, the terrorism insurance taken out by tenant is not required by the lease. Nor, in the event of a loss, would it contribute proceeds supplementing insurance coverage required to be maintained under the lease. The terrorism policy is mutually exclusive to coverage provided by other policies, reciting that it "does not cover any loss or damage which . . . is insured by . . . any other insurance policy or policies either primary or excess." Thus, the terrorism insurance obtained by Solow Management Corporation extending coverage to the subject premises does not implicate the notification provisions of the lease. Consequently, tenant's omission to notify landlord that it had obtained such coverage is not a breach of the lease and provides no basis for landlord's recovery of the amount expended to secure its own terrorism insurance. Since there was no default of the lease by tenant, attorney's fees are not recoverable by landlord under its provisions.

Landlord's counterclaims for negligent misrepresentation and breach of the implied covenant of good faith and fair dealing were properly dismissed as redundant. It is well settled that a party to a contract may not interpose a tort claim unless a legal duty independent of the contract has been breached (*Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.*, 70 NY2d 382, 389 [1987]). The misrepresentation claim is duplicative of the breach of contract cause of action because they seek identical recovery (*see Rockefeller Univ. v Tishman Constr. Corp. of N.Y.*, 240 AD2d 341, 342 [1997], *lv denied* 91 NY2d 803 [1997]) and because the question of whether tenant had any duty to inform landlord of separate insurance coverage is intrinsically related to the performance of the contract (*see McMahan & Co. v Bass*, 250 AD2d 460, 462 [1998], *lv denied and dismissed* 92 NY2d 1013 [1998]). The good faith claim is redundant since, where appropriate, an obligation of good faith and fair dealing will be implied and enforced (*see id.*), and breach of such implied duty is intrinsically related to damages attributable to breach of the lease (*see Canstar v Jones Constr. Co.*, 212 AD2d 452, 453 [1995]). Moreover, an implicit obligation will not be imposed if it is inconsistent with the terms of the governing contract (*Murphy v American Home Prods. Corp.*, 58 NY2d 293, 304 [1983]). Because the scope of tenant's duty to inform landlord is explicitly limited by lease provisions, a more expansive reporting duty may not be imposed by implication.

We reject tenant's contention that its procurement of terrorism insurance rendered landlord's counterclaim moot, requiring its dismissal. Merely because tenant voluntarily obtained coverage, thereby protecting its valuable right to the leasehold, fails to obviate either the question of whether such coverage was required by the lease or whether sums expended by landlord to secure its own terrorism insurance might be recoverable from tenant. It is apparent that, by the time the *Yellowstone* injunction was imposed at the end of October 2002, tenant had obtained sufficient terrorism insurance coverage to presumably cure its default, thereby rendering moot the need for injunctive relief. Tenant's failure to disclose the existence of this coverage is, at best, a discourtesy to the court entertaining the motion. Moreover, having prevailed on its application for a *Yellowstone* injunction on the ground that it was necessary to protect against the consequences of a default under the lease, tenant will not be heard to assert that no such default was in issue. Having persisted in litigating the question of whether it was required to procure the disputed insurance coverage without disclosing that the premises were protected by blanket terrorism insurance, tenant may not adopt the inconsistent position on appeal that its undisclosed procurement of such coverage thereby rendered the issue moot.

Similarly, we decline to accord any significance to landlord's attempt to exploit the semantical difference between the language contained in the judgment appealed from and the primary issue asserted by tenant on appeal. That the court adjudged the lease to require tenant "to obtain insurance coverage which does not exclude terrorism" does not preclude tenant's assertion, on appeal, of the issue of whether "Tenant had a duty under the lease to procure terrorism insurance." As landlord conceded in support of its motion to enjoin third-party defendant from exercising its remedies under the mortgage agreement, "In this case, the Tenant has requested that the Court determine, in essence, what terrorism insurance, if any, it is required to carry under the lease." Thus, landlord cannot contend that this issue has not been preserved for appellate review.

Finally, we note that GMAC Commercial Mortgage Corporation is not a party to the lease, and its lending agreement with landlord is not at issue. Because Supreme Court rendered a wholly favorable declaration that landlord is required to maintain terrorism coverage under the mortgage agreement,

GMAC is not aggrieved by the judgment and lacks standing on this appeal (CPLR 5511).

Accordingly, the judgment, denominated order and judgment (one paper), of the Supreme Court, New York County (Marcy S. Friedman, J.), entered June 22, 2005, which, to the extent appealed from as limited by the briefs, declared that plaintiff TAG 380, LLC has a duty to obtain insurance that does not exclude coverage for terrorism; awarded defendant ComMet 380, Inc. damages for the premiums paid to obtain terrorism coverage; awarded defendant reasonable attorney's fees in connection with the declaratory judgment action; denied defendant recovery of expenses, including reasonable attorney's fees, incurred in connection with the third-party action; denied defendant recovery of disbursements and expenses in connection with the award of attorney's fees incurred in the declaratory judgment action; and dismissed defendant's counterclaims for, inter alia, negligent misrepresentation and breach of the implied covenant of good faith and fair dealing, should be modified, on the law, to the extent of declaring that plaintiff has no duty under the lease to maintain terrorism coverage on the leased premises and vacating the award of damages and attorney's fees to defendant. The Clerk is directed to enter judgment in favor of plaintiff dismissing the counterclaims.

MAZZARELLI, MARLOW, NARDELLI and SWEENY, JJ., concur.

Judgment, denominated order and judgment (one paper), Supreme Court, New York County, entered June 22, 2005, modified, on the law, to the extent of declaring that plaintiff has no duty under the lease to maintain terrorism coverage on the leased premises and vacating the award of damages and attorney's fees to defendant. The Clerk is directed to enter judgment in favor of plaintiff dismissing the counterclaims.