**Mansueto v 80 Pine LLC**

2025 NY Slip Op 32906(U)

August 15, 2025

Supreme Court, New York County

Docket Number: Index No. 152525/2022

Judge: III, Francis A. Kahn

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:  HON. FRANCIS A. KAHN, III

*Justice*

PART          32

------------------------------------------------------------------X

JOHN MANSUETO,

Plaintiff,

- v -

80 PINE LLC, HUNTER ROBERTS CONSTRUCTION
GROUP, L.L.C.,

Defendant.

------------------------------------------------------------------X

80 PINE LLC, HUNTER ROBERTS CONSTRUCTION
GROUP, L.L.C.

Plaintiff,

-against-

OTIS ELEVATOR COMPANY

Defendant.

------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 152525/2022 |
| MOTION DATE | |
| MOTION SEQ. NO. | 002 003 004 |

**DECISION + ORDER ON
MOTION**

Third-Party
Index No. 595691/2024

The following e-filed documents, listed by NYSCEF document number (Motion 002) 56, 57, 58, 59, 60, 61, 62, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 96, 97, 98, 99, 100, 101, 102, 103, 117, 118

were read on this motion to/for                    JUDGMENT - SUMMARY                    .

The following e-filed documents, listed by NYSCEF document number (Motion 003) 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 119, 120, 121, 122, 123, 124, 125, 126, 137, 139

were read on this motion to/for          SUMMARY JUDGMENT(AFTER JOINDER          .

The following e-filed documents, listed by NYSCEF document number (Motion 004) 128, 129, 130, 131, 132, 133, 134, 135, 136, 138, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151

were read on this motion to/for                    DISMISSAL                    .

Upon the foregoing documents, the motions are determined as follows:

In this action, plaintiff, John Mansueto, seeks damages for personal injuries he allegedly sustained on July 7, 2021. Plaintiff alleges that he was injured when elevator doors fell from a dolly (the "Dolly") and struck his left leg. He further alleges that the accident occurred during the course of his work at a construction project (the "Project") located at 345 Park Avenue, in New York County (the "Premises").

At the time of the accident, 80 Pine LLC ("80 Pine") was the owner of the Premises and Hunter Roberts Construction Group, LLC was a contractor on the Project. Plaintiff was an employee of Otis Elevator Company ("Otis"), a subcontractor hired by Hunter to work on the Project.

Plaintiff pleads claims against 80 Pine and Hunter pursuant to Labor Law §§ 240 (1), 200, and common law negligence. The defendants assert third-party claims against Otis for contribution, common law indemnification, contractual indemnification, and for breach of contract for failure to obtain requisite insurance.

In motion sequence 002, plaintiff moves pursuant to CPLR 3212 for summary judgment on his Labor Law §§ 240, 200 and common law negligence claims. Defendants cross-move pursuant to CPLR 3212 for summary judgment dismissing the complaint and for summary judgment on their third-party common law indemnification, contractual indemnification, and breach of contract for failure to obtain requisite insurance claims against Otis.

In motion sequence 003, defendants move pursuant to CPLR 3212 for summary judgment on their third-party common law indemnification, contractual indemnification, and breach of contract for failure to obtain requisite insurance claims against Otis.[1]

In motion sequence 004, Otis moves pursuant to CPLR 1010 to dismiss defendants' third-party complaint without prejudice or in the alterative: order a seperate trial on the third-party action, vacate the stay of disclosure, vacate the note of issue, or an order pursuant to CPLR 3124 directing full and complete disclosure.

### *Plaintiff's Deposition Testimony*

Plaintiff appeared for deposition on June 28, 2023 (NYSCEF Doc. No. 59, Plaintiff's affirmation, exhibit B).[2] At the time of the accident, he was employed by Otis as an elevator mechanic (Plaintiff tr. at 50-51, 67). Plaintiff testified that Otis was on the Project to refurbish elevator doors (*id.* at 67).

Plaintiff testified that his work on the Project consisted of removing and installing elevator doors (*id.* at 65, 67), which included transporting equipment on the worksite (*id.* at 91). He further testified that Otis' scope of work included moving elevator doors (*id.* at 82).

He further testified that Otis had two supervisors on the Project, "Ray Rogers" and "Salmon" (*id.* at 68-69). These were the only two supervisors that plaintiff reported to (*id.* at 69). Plaintiff testified that he would text Salmon every morning when plaintiff got to the worksite and that Salmon was "in charge" of the Project (*id.* at 73). In response to questioning as to what type of direction Salmon gave him, plaintiff testified that he "just checked in with Salmon" (*id.* at 70).

Plaintiff testified that his supervisors were not on the worksite (*id.* at 89). In response to questioning, he confirmed that there was no one from Otis on the worksite that he reported to (*id.* at 89). He further testified that Otis had onsite meetings once a week (*id.* 70-71).

---

[1] Defendants cross-moved for summary judgment (motion sequence 002) before commencing their third-party action against Otis, and made their second motion for summary judgment (motion sequence 003) after commencing the third-party action.

[2] Plaintiff also appeared for deposition on October 26, 2023 (NYSCEF Doc. No. 60, Plaintiff's affirmation, exhibit C). Said deposition solely addressed damages.

Plaintiff testified that Otis did not give him any work instructions or direction (*id.* 70-71, 102). He testified, "Otis gives us a job, and we go to the job site, and then we follow directions through the [general contractor] of what they want us to do" (*id.* at 71). In response to questioning, plaintiff confirmed that no one from Otis told him how to transfer equipment or perform other work on the Project (*id.* at 96-97). He further testified that he did not receive any warnings about specific tasks or instructions on how to transport materials (*id.* at 90). Plaintiff testified that he received instructions on how to transport materials in trade school (*id.* at 90). He further testified that Otis did not hire anyone who did not have this training (*id.* at 139).

Plaintiff testified that he received his work instructions from Hunter (*id.* at 70). He further testified that Hunter supervised him on the Project (*id.* at 101). He testified that an individual from Hunter, "Joe" would coordinate plaintiff's tasks (*id.* at 74). Plaintiff testified that Joe would give him directions on "what I was doing that day, on what elevators, what doors" (*id.* at 70). He further testified, "[Hunter] gave me a list at the beginning of every week what elevators needed to be done" (*id.* at 71). Plaintiff testified that he would "go to [Hunter] for any problems I had on the job. They were in charge of all the construction work" (*id.* at 97-98).

Plaintiff testified that Rubin Construction Company ("Rubin Construction") was the general contractor for the Premises (*id.* at 74). He further testified that Rubin Construction "were the ones that would come and inspect everything, inspect the doors and all that" (*id.* at 74). In response to questioning, plaintiff testified that Rubin Construction and Hunter coordinated the completion of work on the Project (*id.* at 74).

Plaintiff testified that he had transported elevator doors "[t]hroughout [his] career" and every single time he strapped the doors to a dolly (*id.* at 109). He further testified that elevator doors were strapped down so that they would not fall (*id.* at 127).

Plaintiff testified that elevator doors were typically strapped down and that Otis did not have a specific rule about strapping down elevator doors (*id.* at 121-122). He further testified that Otis owned the dollies that he was using on the worksite and that Otis was the only one that provided him with equipment (*id.* at 97)

Plaintiff testified that Otis provided him with straps to strap down the elevator doors, but that he was not allowed to use these straps (*id.* at 76). He testified that Otis advised its employees to use the straps "in the beginning of the job. We just couldn't" (*id.* at 75-76). Plaintiff testified that when the Otis workers were moving elevator doors on dollies, they were not allowed to strap down the doors because doing so would scratch the finish on the doors (*id.* at 125-126). When asked why Otis employees could not use the straps, plaintiff testified, "[b]ecause the general contractor would decide to finish the doors before we installed them on the 20th floor of the building, and they wouldn't allow us to strap them because the finish would be destroyed" (*id.* at 76).

In response to questioning, plaintiff confirmed that after he informed Otis that moving the elevator doors without straps was unsafe, he still had to move the elevator doors (*id.* at 82). He testified that Otis conducted safety meeting with its employees (*id.* at 72). He further testified that at one of these meetings he made Otis aware that it was unsafe to move the elevator doors without strapping them down (*id.* at 80-81). Plaintiff testified that after he advised Otis of this unsafe practice, Otis informed him that "[t]hey had a discussion with [Hunter] that [Hunter] were supposed to move the doors from 20th floor

[* 3]

and put them in front of the elevator, and I don't know what transpired from that" (*id.* at 80-81). Plaintiff testified that he did not know if Otis brought up the issue with Hunter (*id.* at 121).

Plaintiff further testified that he advised Hunter that moving the elevator doors without straps was unsafe (*id.* at 120-121). He testified that Hunter also had safety meetings (*id.* at 78). He further testified that he brought up how unsafe it was to move the elevator doors (without straps) at all of the Hunter safety meetings (*id.* at 85). Plaintiff further testified that Hunter and Rubin Construction inspected the elevator doors on the Project (*id.* at 109).

Plaintiff testified that on the date of the accident he was transferring two elevator doors (the "Doors") with the Dolly from the 20th floor of a building on the Premises (the "Building") to be installed in a lobby elevator (*id.* at 94, 99-100, 105-106). Plaintiff testified that Hunter had given him a list "from the beginning of the week" indicating his work for that day (*id.* at 112-113).

Plaintiff testified that he inspected the area before transporting the Doors and did not find any debris or trip and fall hazards (*id.* at 95-96). He further testified that he inspected the Dolly and that there was nothing wrong with it (*id.* at 109-110). Plaintiff testified that Otis had provided him with safety equipment including straps to strap down the Doors to the Dolly (*id.* at 75, 121-122).

Plaintiff testified that he and his working partner, Winchester, took a freight elevator to the 20th floor and found the Doors (*id.* at 101, 120). Plaintiff testified that he and Winchester lifted the Doors and placed them on the Dolly (*id.* at 121). In response to questioning, plaintiff confirmed that the Doors were not secured to the Dolly because of the instruction not to use straps (*id.* at 156-157).

Plaintiff testified that he and Winchester took the Dolly and the Doors from the 20th floor to the front of the Building (*id.* at 122-124). Plaintiff further testified that he was at the front of the Dolly and Winchester was at the back (*id.* at 123). Plaintiff testified that the Doors weighed approximately 150 to 200 pounds each (*id.* at 140), with a combined weight of approximately 300 pounds (*id.* at 156).

Plaintiff testified that the accident occurred as they were moving the Dolly into the lobby of the Building (*id.* at 125). He testified that they "wheeled the doors though the lobby to the turnstile" (*id.* at 125). Plaintiff testified that a security guard was holding the door to the Building open for them (*id.* at 127).

Plaintiff testified that while the Dolly was between the glass turnstile and the lobby, the Doors fell off the Dolly and struck his left leg (*id,* 124-125, 129, 134). He testified that immediately before the accident he was holding the Dolly and not touching the Doors (*id.* at 128). He further testified that Winchester was holding the back of the Dolly behind the turnstile (*id.* at 128). Plaintiff did not know if Winchester was touching the Doors at the time of the accident (*id.* at 129).

### Affidavit of Shawn Winchester, Otis employee

Shawn Winchester prepared an affidavit (the "Winchester Affidavit") (NYSCEF Doc. No. 61, Plaintiff's affirmation, exhibit D), wherein he states that on the date of the accident he was an Otis employee working on the Project (Winchester Affidavit at ¶ 1). Winchester states that Hunter was the general contractor in the Project and the Otis was hired as the elevator subcontractor (*id.* at ¶ 2).

Winchester states that "[a]t approximately 11:00 a.m. I was working with my co-worker John Mansueto. We were tasked with transporting two elevator doors on an 'A-Frame Dolly'" (*id.* at ¶ 5). He further states that the elevator doors each weighed approximately 150 lbs (*id.* at ¶ 5).

Winchester states:

"We were instructed that we were not permitted to secure the doors with straps or any other safety device, as Hunter Roberts was concerned that securing the doors could harm the finish.

As a result, we were made to transport the unsecured elevator doors without any safety device to secure them" (*id.* at ¶¶ 7, 8).

Winchester states that he and plaintiff were moving the Doors, when one of them fell and struck plaintiff (*id.* at ¶ 9). He further states "[n]either myself or John Mansueto did anything wrong to cause the elevator door to fall. The elevator door fell because it was not secured (*id.* at ¶ 10).

### *Affirmation of Salman Zaidi, Modernization Superintendent for Otis*

Salman Zaidi prepared an affirmation (the "Zaidi Affirmation") (NYSCEF Doc. No. 92, Defendants' affirmation in support of cross-motion, exhibit G), wherein he states that at the time of the accident he was Otis' Modernization Superintendent assigned to the Project (Zaidi Affirmation at ¶¶ 1, 5). Zaidi states that plaintiff was an "adjuster" on the Project and that Zaidi oversaw plaintiff's work (*id.* at ¶¶ 5, 6).

Zaidi states that the scope of Otis' work on the project "included replacement of the elevator hoist way doors of the lobby floor of the building" (*id.* at ¶ 11). He further states that the elevator doors weighted between 104 and 114 pounds (*id.* at ¶ 12). He states:

"The [elevator] doors were delivered with a brass finish, and the building hired an outside vendor to apply a final finish and seal the doors. After the doors were finished and sealed, the doors were transported from the 20th floor to the relevant floor for installation using an a-frame dolly. The top of the platform on which the elevator doors rested was approximately six (6) inches off the ground" (*id.* at ¶ 12).

Zaidi states that plaintiff's accident occurred towards the end of the Project, when the final elevator doors were being installed in the lobby and that there had been no issues raised as to the door installation (*id.* at ¶ 13). Zaidi states:

"At the start of the job, with regard to the finish on the doors, I advised that Mr. Mansueto and Mr. Winchester it was important to be careful when moving the doors as they were final, finished equipment. Blankets were available to use to protect the finish on the doors when strapped to the dolly. In the event there were any scratches or damage to the doors, I instructed Mr. Mansueto and Mr. Winchester to take photographs of the damage, and I would then advise the customer. This happened on a number of occasions, and the procedure was that any damaged doors would be sent for re-finishing, at Otis's expense. The door finish could be scratched by something sharp like a tool, but regular

handling, including with Otis safety gloves, would not mar or damage the elevator door's finish" (*id.* at ¶ 14).

Zaidi states that Otis provided plaintiff with equipment to install the elevator doors, including an a-frame dolly, safety gloves, straps for securing loads to the dolly, and cloth/blankets to protect "any finished work being transported" (*id.* at ¶ 19). He states:

"Mr. Mansueto was advised at the commencement of the work at the jobsite to use straps when transporting the elevator doors on a dolly, and straps were available at the jobsite, and I never heard anyone instructing Mr. Mansueto not to use safety straps, nor did Mr. Mansueto ever tell me this" (*id.* at ¶ 20).

Zaidi further states that plaintiff was required to complete a daily Job Hazard Analysis Form ("JHA Form") and send it to plaintiff's supervisor (*id.* at ¶ 8). He states that plaintiff's submitted JHA Forms do not mention that plaintiff was instructed not to use straps when transporting the elevator doors (*id.* at ¶ 20).

Zaidi states that "[i]n addition to the Otis Safety Meeting, Mr. Mansueto was required to attend regular safety meetings conducted by the General Contractor Hunter Roberts" (*id.* at ¶ 26). Zaidi states that neither plaintiff nor Winchester raised any safety concerns at the monthly Otis safety meeting or at any other time (*id.* at ¶ 27). He further states that plaintiff and Winchester never raised any safety concerns or issues on the Project (*id.* at ¶ 27).

Zaidi states that he was not present when the accident occurred, "but was present at the lobby building shortly after it occurred" (*id.* at ¶ 28). He further states that "Mr. Mansueto told me that the elevator door shifted and hit him in the knee while he and Mr. Winchester were moving the dolly through the turnstile in the lobby" (*id.* at ¶ 28).

### *Affirmation of John Robitzski, Senior Project Manager for Hunter, dated November 26, 2024*

John Robitzski prepared an affirmation (the "Robitzski Affirmation") (NYSCEF Doc. No. 114), wherein he states that at the time of the accident he was Hunter's Senior Project Manager on the Project (*id.* at ¶ 3). He further states that Hunter was the construction manager on the Project and that Otis was a subcontractor that Hunter retained "for the elevator scope of work at the Project" (*id.* at ¶¶ 4, 5).

Robitzski states, "[Hunter] did not direct, control or supervise any of the means or methods of Otis' work at the Project, including what tools and/or equipment Otis would determine was needed to perform its work properly and safely" (*id.* at ¶ 6). Robitzski states that at the time of the accident "Otis transported elevator doors using an Otis dolly" (*id.* at ¶ 9) and that "Otis secured elevator doors to the Otis dolly with Otis furnished straps and used blankets/cloth protections to protect the doors" (*id.* at ¶ 10). He further states that the elevator doors weighed approximately 100 pounds (*id.* at ¶ 7).

Robitzski states that "he never received any complaints from Otis about Otis workers having any issues transporting the elevator doors" (*id.* at ¶ 12). Robitzski has not firsthand knowledge of the accident (*id.* at ¶ 8).

Defendants argues that plaintiff's summary judgment motion is defective as his memorandum of law was untimely and he failed to include a statement of material facts as required by 22 NYCRR 202.8-

g. Initially, although defendants state that "Plaintiff's memorandum of law was untimely" (NYSCEF Doc. No. 72, Defendants memorandum of law in opposition to plaintiff's motion at 6), they have not presented any arguments in support of this position. As such, defendants' argument on this point is without merit.

Further, 22 NYCRR 202.8-g indicates that a court "may direct that there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts" (22 NYCRR 202.8-g [a]). As such, a statement of material facts is no longer mandatory and it is within the Court's discretion to require one (*See e.g. Bandler v Consolidated Edison Co. of N.Y., Inc.,* 2023 NY Slip Op 31118(U), 3-4 [Sup Ct, New York County]).

The court's part rules do not require the filing of a section 202.8-g (a) material statement of facts. As such defendants' argument on this point is moot, and the court will determine the motions on the merits.

## DISCUSSION

### Otis' motion to dismiss the third-party action without prejudice (Motion Seq 004)

Otis moves pursuant to CPLR 1010 to dismiss defendants' third-party complaint without prejudice. CPLR 1010 reads as follows:

"The court may dismiss a third-party complaint without prejudice, order a separate trial of the third-party claim or of any separate issue thereof, or make such other order as may be just. In exercising its discretion, the court shall consider whether the controversy between the third-party plaintiff and the third-party defendant will unduly delay the determination of the main action or prejudice the substantial rights of any party."

Otis argues that defendants did not commence the third-party action until 144 days after plaintiff commenced the main action, after plaintiff had already filed a note of issue indicating trial readiness, and after plaintiff and defendants had both moved for summary judgment (motion sequences 002).[3] Otis further argues that although discovery has been completed in the main action, it has not had the opportunity to engage in discovery, nor have the defendants responded to Otis' discovery demands.

Defendants argue that their third-party action should not be dismissed as it involves the same issues of fact and law as the main action.[4] They further argue that Otis would not be prejudiced as it "already had the discovery needed" (NYSCEF Doc. No. 240, Defendants affirmation in opposition at ¶ 13). In addition, defendants attach an email dated July 17, 2024 (the "July 17, 2024, Email") (NYSCEF Doc. No. 142, Defendants affirmation in opposition, exhibit B), which they argue establishes that Otis

---

[3] Otis' arguments for dismissing the third-party action without prejudice are drawn from their moving papers (motion sequence 004) (NYSCEF Doc. No. 129-135), their opposition to defendants' cross-motion (motion sequence 002) (NYSCEF Doc. No. 100-103) and their opposition to defendants' post-joinder motion for summary judgment (motion sequence 003) (NYSCEF Doc. No. 119-126).

[4] Defendants' arguments in opposition to dismissing the third-party action without prejudice are drawn from their opposition to Otis' motion to dismiss (motion sequence 004) (NYSCEF Doc. No. 140-147), their reply to Otis' opposition to defendants' cross-motion (motion sequence 002) (NYSCEF Doc. No. 117-118) and their reply to Otis' opposition to their post-joinder summary judgment motion (motion sequence 003) (NYSCEF Doc. No. 137).

was aware of the main action significantly prior to July 17, 2024. Plaintiff does not oppose dismissal of the third-party action without prejudice.

Here, Otis has established that the third-party action should be dismissed without prejudice pursuant to CPLR 1010. Specifically, Otis would be prejudiced by allowing the two actions to go forward together. Further, allowing both actions to go forward would unduly delay the main action and dismissing the third-party action without prejudice would not unduly delay the main action.

The issue of defendants' negligence as to the plaintiff's accident speaks directly to their third-party contractual indemnification claims against Otis (*See Cackett v Gladden Props., LLC,* 183 AD3d 419, 422 [1st Dept 2020]). Further, defendants did not commence the third-party action until more than a hundred days after the commencement of the main action, after plaintiff had already filed their note of issue indicating that discovery had been completed, and after plaintiff and defendants had each moved for summary judgment. In addition, although defendants' cross-motion for summary judgment (motion sequence 002) seeks summary judgment on their third-party common law indemnification, contractual indemnification and breach of contract claims against Otis (NYSCEF Doc. No. 82, Defendants Notice of Motion at 2), no such claims were included in their verified answer, nor did they commence the third-party action until after cross-moving for summary judgment.

Further, the July 17, 2024, E-mail is insufficient to support defendants' argument that Otis had notice of the main action significantly prior to said date. The July 17, 2024, E-mail does not include any references to the main action nor the underlying facts. Even assuming arguendo that the email did refer to the main action, at most it suggests that Otis had notice of the main action as of July 17, 2024, after the notice of issue and motions for summary judgment had already been filed (motion sequence 002).

Otis has been prejudiced by both defendants' delay in bringing the third-party action and being denied the opportunity to engage in discovery (*See Lopez v. Halletts Astoria LLC,* 205 AD3d 573, 575-576 [1st Dept 2022]). Further, "plaintiff, who has filed a note of issue, [and moved for summary judgment] would be prejudiced by the delay caused by the need for discovery in the third-party action" (*Torres v Visto Realty Corp.*, 106 AD3d 645, 645 [1st Dept 2013]).

As such, defendant's third-party action against Otis is hereby dismissed without prejudice. Further, as the third-party action is being dismissed without prejudice, defendants' motion for summary judgment on their third-party claims (motion sequences 003) and the portion of their cross-motion seeking summary judgment on their third-party claims (motion sequence 002) are denied as moot.

### *Plaintiff's motion and defendants' cross-motion for summary judgment (Motion Seq 002)*

It is well established that "[t]he proponent of summary judgment must establish its defense or cause of action sufficiently to warrant a court's directing judgment in its favor as a matter of law" (*Ryan v Trustees of Columbia Univ. in the City of N.Y., Inc.*, 96 AD3d 551, 553 [1st Dept 2012] [internal quotation marks and citations omitted]). "Thus, the movant bears the burden to dispel any question of fact that would preclude summary judgment" (*id*). "Once this showing has been made, the burden shifts to the nonmoving party to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact that require a trial for resolution" (*Giuffrida v Citibank Corp.*, 100 NY2d 72, 81 [2003]).

"[F]acts must be viewed in the light most favorable to the non-moving party" (*Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012] [internal quotation marks and citations omitted]). If there is any doubt as to the existence of a triable issue of fact, summary judgment must be denied (*Rotuba Extruders v Ceppos*, 46 NY2d 223, 231 [1978]; *Grossman v Amalgamated Hous. Corp.*, 298 AD2d 224, 226 [1st Dept 2002]).

### *Plaintiff's Labor Law § 240 (1) claim*

Plaintiff moves for summary judgment as to liability on his Labor Law § 240 (1) claims. Defendants oppose and cross-move for summary judgment dismissing the claim. Labor Law § 240 (1), also known as the Scaffold Law reads as follows:

"Scaffolding and other devices for use of employees
"1. All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed."

"[T]he Labor Law imposes absolute liability on owners and general contractors for injuries that are proximately caused by the failure to provide appropriate safety devices to workers subject to gravity-related risks" (*Ladd v Thor 680 Madison Ave LLC*, 212 AD3d 107, 111 [1st Dept 2022]). To prevail on a Labor Law § 240 (1) claim, plaintiff must show that the statute was violated, and that this violation was a proximate cause of his injuries (*See Blake v Neighborhood Hous. Servs. of N.Y. City*, 1 NY3d 280, 287 [2003]). "[T]he single decisive question is whether plaintiff's injuries were the direct consequence of a failure to provide adequate protection against a risk arising from a physically significant elevation differential" (*Runner v New York Stock Exch., Inc.*, 13 NY3d 599, 603 [2009]).

Plaintiff argues that he is entitled to summary judgment on his Labor Law § 240 (1) claim as his accident involved a gravity related risk and defendants' failure to provide adequate safety equipment was a proximate cause of the accident. Specifically, plaintiff argues that the Doors constituted a gravity related risk and that plaintiff was instructed not to strap the Doors to the Dolly.

Defendants argue that plaintiff's accident does not fall within the scope of Labor Law § 240 (1) as the Doors shifted on the Dolly and gravity was not involved in the accident. They further argue that plaintiff was provided with the straps necessary to secure the Door to the Dolly, and that he was the sole proximate cause of the accident for failing to use the straps. In addition, they argue that plaintiff was recalcitrant for failing to follow specific instructions to use the straps while transporting the Doors.

Initially, there is no dispute that the defendants are proper Labor Law defendants. Defendants do not dispute that 80 Pine was the owner of the Premises or that Hunter was also a proper Labor Law Defendant.[5]

---

[5] The Court notes that defendants state in their statement of material facts that Hunter was the construction manager on the Project (NYSCEF Doc. No. 82 at ¶ 9). However, defendants do not argue in opposition to plaintiff's summary judgment motion nor in support of their cross-motion for summary judgment that 80 Pine

[* 9]

Further, plaintiff has established prima facie that his accident falls within the scope of Labor Law § 240. Both Plaintiff and Winchester stated that the Doors fell off the Dolly and struck plaintiff (Plaintiff tr. at 124-125, 129, 134; Winchester Affidavit at ¶ 9). In addition, they both stated that the Doors each weighed approximately 150 pounds (Plaintiff tr. at 140, Winchester Affidavit at ¶ 5). Taken together, plaintiff and Winchester's descriptions of the accident establish that the accident falls within the scope of labor Law 240 (1) (*See Nyanteh v. 590 Madison Ave., LLC,* 238 AD3d 643, 643 [1st Dept 2025][accident involving heavy metal sheets falling from an A-Frame cart onto plaintiff was within the scope of Labor Law § 240 (1)]; *Hernandez v. Port Auth. of N.Y. & N.J.,* 238 AD3d 408, 409 [1st Dept 2025][accident involving masonite falling from a dolly onto plaintiff was within the scope of Labor Law § 240 (1)]; *Touray v HFZ 11 Beach St. LLC,* 180 AD3d 507, 507 [1st Dept 2020][accident involving 100 lbs cement boards falling from an A-Frame cart onto plaintiff was within the scope of Labor Law § 240 (1)). Defendants have failed to create an issue of fact in opposition on this point.

A claim, under Labor Law § 240(1) "requires both a violation of the statute and causation" (*Mejia v Super P57 LLC,* , 215 AD3d 491, 491 [1st Dept 2023] *citing Blake v Neighborhood Hous. Servs. of N.Y. City,* 1 NY3d at 288-289). "A defendant has no liability under Labor Law § 240 (1) when plaintiffs: (1) had adequate safety devices available, (2) knew both that" the safety devices "were available and that they were expected to use them, (3) chose for no good reason not to do so, and (4) would not have been injured had they not made that choice." (*Biaca-Neto v Boston Rd. II Hous. Dev. Fund Corp.,* 34 NY3d 1166, 1167-1168 [2020] [internal quotation marks and citation omitted]). Further, a plaintiff is not entitled to recover under Labor Law § 240 (1) where he or she was recalcitrant.

In order to establish that plaintiff was recalcitrant, defendants must show that plaintiff "deliberately refused to obey a direct and immediate instruction to use an available safety device or a standing order" (*Vitucci v Durst Pyramid LLC,* 205 AD3d 441, 444 [1st Dept 2022], *citing Saavedra v 89 Park Ave. LLC,* 143 AD3d 615 [1st Dept 2016]) and that said failure was the sole proximate cause of his injury (*See Vasquez v Cohen Bros. Realty Corp.,* 105 AD3d 595, 598 [1st Dept 2013] ["[A]n instruction to avoid an unsafe practice is not a sufficient substitute for providing a worker with a safety device to allow him to complete his work safely"]; *see also Saavedra v 89 Park Ave. LLC,* 143 AD3d 615, 615 [1st Dept 2016] ["While the site safety manager … testified that she told plaintiff that he should not work in the room because it was unsafe due to all the debris, she explicitly denied that she directed plaintiff to stop work, explaining that she had no such authority."]; *see also Hernandez v. 151 Sullivan Tenant Corp.,* 307 AD2d 207, 207 [1st Dept 2009] ["Inasmuch as defendant points to no immediate instruction to avoid an unsafe practice that plaintiff disobeyed, its attempt to portray him as a recalcitrant worker fails."]).

Here, there are issues of fact as to whether plaintiff was the sole proximate cause of the accident and whether he was recalcitrant. Specifically, there are issues of fact as to whether plaintiff was directed not to strap the Doors to the Dolly.

There is no dispute that Otis provided plaintiff with straps to strap the Doors to the Dolly. However, the parties present conflicting proof as to whether plaintiff was specifically instructed not to use these straps. Plaintiff testified that the general contractor on the Project did not allow Otis' workers to strap down the elevator doors because doing so would have scratched the finish (Plaintiff tr. at 125-126). Plaintiff further testified that he brought up this unsafe practice to both Hunter and Otis, but still

and/or Hunter are not proper Labor Law Defendants (*See See JP Morgan Chase Bank, N.A. v Jones,* 194 AD3d 483, 483[1st Dept 2021], *citing Esponda v Ramos-Ciprian,* 179 AD3d 424, 426 [1st Dept 2020]).

had to move the elevator doors without strapping them down (*id.* at 80-82, 85, 120-121). Winchester, the Otis employee who moved the Doors with plaintiff, stated that he and plaintiff were "not permitted to secure the doors with straps or any other safety device as Hunter Roberts was concerned that securing the doors could harm the finish" and that they "were made to transport the unsecured elevator doors without any safety device to secure them" (Winchester Affidavit at ¶¶ 7, 8).

Defendants' submitted affirmations directly contradict plaintiff and Winchester. Zaidi, Otis' Modernization Superintendent assigned to the Project, affirms that he never heard anyone instructing plaintiff not to use safety straps nor did plaintiff ever tell him that plaintiff was instructed not to use safety straps (Zaidi Affirmation at ¶ 20). Zaidi also affirms that plaintiff was provided with blankets to protect the finish on the doors and that "regular handling" would not have damaged the doors' finish (*id.* at ¶ 14). Robitzski, Hunter's Senior Project Manager on the Project, affirms that he did not receive any complaints from Otis' workers about transporting the elevator doors (Robitzski Affirmation at ¶ 12).

Zaidi and Robitzski's affirmations directly contradict plaintiff and Winchester as to whether plaintiff was directed not to strap the Doors to the Dolly when moving them. These issues of fact speak directly to recalcitrance and whether plaintiff was the sole proximate cause of the accident.

As such, plaintiff is not entitled to summary judgment on his Labor Law § 240 (1) claim. Similarly, defendants are not entitled to summary judgment dismissing the claim.

### *Plaintiff's Labor Law § 200 and common law negligence claims*

Plaintiff moves for summary judgment as to liability on his Labor Law § 200 and common law negligence claims. Defendants oppose and cross-move for summary judgment dismissing the claims. Labor Law § 200 (1) states, in pertinent part, as follows:

> "All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places. All machinery, equipment, and devices in such places shall be so placed, operated, guarded, and lighted as to provide reasonable and adequate protection to all such persons."

Labor Law § 200 "codifies an owner's or general contractor's common-law duties of care, there are 'two broad categories' of personal injury claims: 'those arising from an alleged defect or dangerous condition existing on the premises and those arising from the manner in which the work was performed.'" (*Rosa v 47 E. 34th St. (NY), L.P.*, 208 AD3d 1075, 1081 [1st Dept 2022], quoting *Cappabianca v Skanska USA Bldg. Inc.*, 99 AD3d 139, 144 [1st Dept 2012]). Neither common law negligence nor Labor Law § 200 makes an owner or contractor vicariously liable for the negligence of a downstream subcontractor (*See DeMaria v RBNB 20 Owner, LLC*, 129 AD3d 623, 625 [1st Dept 2015], citing *Burkoski v Structure Tone, Inc.*, 40 AD3d 378, 381 [1st Dept 2007]). "Where an existing defect or dangerous condition caused the injury, liability attaches if the owner or general contractor created the condition or had actual or constructive notice of it. Where the injury was caused by the manner and means [means and methods] of the work, including the equipment used, the owner or general contractor is liable if it actually exercised supervisory control over the injury-producing work." (*Cappabianca v Skanska USA Bldg. Inc.*, 99 AD3d at 144 [internal citations omitted]; *see also Toussaint v Port Auth. of*

[* 11]

*N.Y. & NY*, 38 NY3d 89, 94 [2022][to recover under Labor Law § 200 "a plaintiff must show that an owner or general contractor exercised some supervisory control over the operation"]).

Plaintiff argues that he is entitled to summary judgment as the accident arose from the means and methods of the work and Hunter exercised the requisite control over plaintiff's work. Specifically, he argues that Hunter directed plaintiff not to strap the Doors to the Dolly, which caused plaintiff's accident. Plaintiff does not argue that 80 Pine exercised the requisite control over his work to be held liable pursuant to Labor Law § 200 or at common law.

Defendants argue that neither Hunter nor 80 Pine exercised the requisite authority over plaintiff's work to be potentially liable pursuant to Labor Law § 200 or at common law.

Plaintiff's accident arose from the means and methods of his work, specifically the manner in which he transported the Doors on the Dolly. As such, defendants' potential liability is dependant upon the degree to which Hunter and/or 80 Pine exercised control over the injury producing work.

Here, defendants have established prima facie that 80 Pine did not exercise the requisite control over the injury producing work to be held liable pursuant to Labor Law § 200 or at common law. Nothing from plaintiff's testimony, Winchester's affidavit, nor the defendants' submitted affirmations suggests that 80 Pine directed any of plaintiff's work on the Project. Further, plaintiff does not oppose defendants' argument that 80 Pine did not exercise the requisite control over plaintiff's work (*See JP Morgan Chase Bank, N.A. v Jones*, 194 AD3d 483, 483[1st Dept 2021], citing *Esponda v Ramos-Ciprian*, 179 AD3d 424, 426 [1st Dept 2020]).

As such, defendants are entitled to summary judgment dismissing plaintiff's Labor Law § 200 and common law negligence claims as against 80 Pine. Similarly, plaintiff is not entitled to summary judgment on his Labor Law § 200 and common law negligence claims as against 80 Pine.

Here, there are issues of fact as to whether Hunter is liable pursuant to Labor Law § 200 and at common law. The question of whether Hunter exercised the requisite control over the injury producing work hinges upon whether Hunter directed plaintiff not to strap down the elevator doors when transporting them. Any such direction would constitute an exercise of control sufficient to fall within the scope of Labor Law § 200 and common law negligence. For the previously stated reasons, there are issues of fact as to whether plaintiff was directed not to strap the Doors to the Dolly.

As such, plaintiff is not entitled to summary judgment on his Labor Law § 200 and common law negligence claims. Similarly, defendants are not entitled to summary judgment dismissing these claims as against Hunter. The parties' remaining arguments have been considered and found unavailing.

Accordingly, it is:

ORDERED that plaintiff, John Mansueto's, motion for summary judgment pursuant to CPLR 3212 as to liability in his favor on his Labor Law §§ 240, 200 and common law negligence claims (motion sequence 002) is denied; and it is further

ORDERED that defendants, 80 Pine LLC ("80 Pine") and Hunter Roberts' ("Hunter"), cross-motion for summary judgment pursuant to CPLR 3212 dismissing the complaint (motion sequence 002)

is granted to the extent that plaintiff's Labor Law § 200 and common law negligence claims are hereby dismissed as against 80 Pine and the motion is otherwise denied; and it is further

ORDERED that defendants' motion for summary judgment pursuant to CPLR 3212 on their third-party common law indemnification, contractual indemnification, and breach of contract for failure to obtain requisite insurance claims against Otis Elevator Company ("Otis") (motion sequence 003) is denied; and it is further

ORDERED that Otis' motion to dismiss defendants' third-party complaint without prejudice pursuant to CPLR 1010 or in the alterative: order a sperate trial on the third-party action, vacate the stay of disclosure, vacate the note of issue, or an order pursuant to CPLR 3124 directing full and complete disclosure (motion sequence 003) is granted to the extent that defendants' third-party action against Otis is hereby dismissed without prejudice and the motion is otherwise denied.

| 8/15/2025 | | FRANCIS A. KAHN, III, A.J.S.C. |
|-----------|--|--------------------------------|
| DATE | | |

CHECK ONE:

| | CASE DISPOSED | X | NON-FINAL DISPOSITION | |
|--|--|--|--|--|
| | GRANTED | [ ] DENIED | X | GRANTED IN PART | | OTHER |

APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER |

CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | | REFERENCE |